IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CR-170-H

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CADARYE LOVONZO JORDAN II,<br>Defendant. | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the court on Defendant's motion to suppress [DE #26]. The Government filed a response in opposition to the motion to suppress. To further develop the record, the undersigned conducted an evidentiary hearing on November 20, 2013, at which the Government and Defendant, with counsel, appeared. Accordingly, the matter is now ripe for decision.

## STATEMENT OF THE CASE

On June 11, 2013, a federal grand jury returned a two-count indictment against Cadarye Lovonzo Jordan II ("Defendant"), charging him with possession of a firearm by a felon and possession with the intent to distribute a quantity of marijuana. (Indictment [DE #1] at 1–2.)

On September 17, 2013, Defendant filed the instant motion to suppress all evidence against him. Defendant contends that the evidence was obtained as a result of the entry and search of Defendant's property by a K-9 law enforcement team without license or probable cause in violation of the rule announced in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), and the Fourth

Amendment. The Government contends that the search conducted in the instant case is distinguishable from *Jardines* and does not violate the Fourth Amendment.

### STATEMENT OF THE FACTS

Sergeant Jason Greene ("Sgt. Greene"), a law enforcement officer with the Wake County Sheriff's Office ("WCSO") was the sole witness to testify at the evidentiary hearing in this case. As there is no dispute with respect to the facts related by Sgt. Greene, the undersigned makes the following findings of fact based on his testimony.

Sgt. Greene has been a law enforcement officer with the WCSO for approximately fifteen years. At the time of Defendant's arrest, Sgt. Greene was a deputy with the WCSO. He has been a canine handler for ten years. Justice is a trained law enforcement dog certified to detect narcotics and track people. Sgt. Greene has been Justice's handler for four years. On October 27, 2012, between 6:00 a.m. and 6:30 a.m., Sgt. Greene received a call from dispatch requesting a tracking canine to report to 3108 Varcroft Road in Knightdale in response to a breaking and entering of a motor vehicle. Sgt. Greene arrived on the scene at approximately 7:00 a.m. A homeowner at the scene reported having seen the suspect flee and indicated the direction that the suspect had taken. Justice picked up the trail at the scene of the breaking and entering, and Sgt. Greene and Justice proceeded to track the suspect. While in the backyard of a home in the neighborhood, Justice lost the suspect's track. Sgt. Greene began recasting in order to recapture the suspect's trail. At that point, Justice began "wind scenting," an act commonly performed by canines while tracking narcotics or individuals. As a result of his wind scenting, Justice picked up a track, which Sgt. Greene believed to be the suspect. Sgt. Greene and Justice began working the trail, leading them to a storage building in the rear yard of 3040 Van Dorn Road, later determined to be Defendant's residence.

2

When Justice alerted on the storage building, Sgt. Greene believed the suspect to be hiding in the storage building and approached. Upon nearing the storage building, Sgt. Greene smelled a strong odor of marijuana. Sgt. Greene then realized Justice was no longer tracking the fleeing suspect but instead was tracking the scent of marijuana. After determining that the suspect was not in the building, Sgt. Greene made note of the address and resumed tracking the suspect. Sgt. Greene and Justice ultimately lost the suspect's trail about a quarter of a mile from Defendant's residence.

After losing the suspect's trail, Sgt. Greene returned to Defendant's residence and knocked on the front door to speak with the homeowner. Telisha Mann ("Mann") answered the door and confirmed she was the homeowner. Sgt. Greene asked whether anyone else lived at the property. Mann hesitated and said her fiancé, Defendant, lived at the residence. Mann consented to a search of the storage building but told Sgt. Greene he would have to wait until Defendant returned home because she did not have the key. Mann told Sgt. Greene that Defendant was in Greensboro and that she had last seen him the night before. At this point, Sgt. Greene remembered seeing a grey truck in the driveway earlier in the day and asked Mann who owned the truck. Mann told Sgt. Greene that Defendant drove a truck but claimed that the truck parked in the driveway earlier belonged to a friend. When Sgt. Greene asked if Defendant's truck was grey, Mann responded "maybe" and stated that she could not remember.

While speaking to Sgt. Greene, Mann called Defendant, and Sgt. Greene explained the situation to him. Defendant stated he would return to the residence with the key to the storage building. Sgt. Greene waited approximately thirty minutes, then left to obtain a search warrant for the residence and the storage building based on the canine alert and the odor of marijuana detected by Sgt. Greene. Three patrol sergeants and one deputy remained at the scene while Sgt.

3

Greene went to the Magistrate's Office at the Wake County Detention Center to obtain the search warrant. Sgt. Greene returned to the residence and served the warrant. He was in the process of retrieving a pry bar to open the storage building when Defendant drove up in the grey pick-up truck that Sgt. Greene had seen earlier at Mann's house.

When Defendant got out of the vehicle, he was nervous and shaking. Sgt. Greene explained the search warrant to Defendant, and Defendant gave Sgt. Greene the key to the storage building. When Sgt. Greene opened the door, there was an "overwhelming odor of marijuana." Sgt. Greene deployed Justice, and Justice alerted on a cardboard box inside the building. Sgt. Greene opened the box and found several large, black, plastic trash bags containing a total of approximately fifteen pounds of marijuana.

Another thirteen pounds of marijuana were found inside the residence. Sgt. Greene deployed Justice in the upstairs of the residence in the area around the bedrooms. Justice alerted on a safe in the master bedroom closet. Inside the safe was over twenty thousand dollars in United States currency, a firearm, and Defendant's passport and other documents.

## DISCUSSION

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Generally, a search warrant must be obtained in order for a search of the home or curtilage to be considered reasonable. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *see also Oliver v. United States*, 466 U.S. 170, 180 (1984) (regarding curtilage as "part of home itself for Fourth Amendment purposes"). "The government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Florida v. Jardines*, 133 S. Ct. 1409, 1417–18 (2013).

Defendant contends that the entry and search of his property by a K-9 law enforcement team was without license or probable cause and thus violated his Fourth Amendment rights. Defendant bases his argument solely upon the holding in *Jardines* that use of a trained police dog to investigate the home and surrounding curtilage constitutes a search within the meaning of the Fourth Amendment.

In *Jardines*, the United States Supreme Court affirmed the suppression of evidence obtained when officers (acting without a warrant or probable cause) approached a residence with a trained drug-sniffing dog for the purpose of determining whether narcotics were present in the home. *Jardines*, 133 S.Ct. at 1413, 1417–18. A detective in the case had "received an unverified tip that marijuana was being grown" in Jardines' residence. *Id.* at 1413. One month later, the detective observed the home for a period of about fifteen minutes. *Id.* During his observation, he saw no cars visit the premises and could not see inside because the blinds were drawn. *Id.* A detective trained as a canine handler arrived with a drug-sniffing dog, and both detectives approached the residence. *Id.* As the detectives approached the porch of the home, the dog seemed to sense one of the substances which he had been trained to detect. *Id.* Once on the porch, the dog alerted, indicating the presence of contraband within the residence. *Id.* The officers themselves never smelled the marijuana that was later discovered inside the residence, but rather obtained a search warrant based solely on the canine's alert. *Id.*

The *Jardines* Court held that the officers' actions constituted a search within the meaning of the Fourth Amendment as the officers were "gathering information . . . in the curtilage of [Jardines'] house . . . by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 1414. Key to the Court's decision in *Jardines* was the officers' "unlicensed physical intrusion" upon Jardines' property. "[A]n

officer's leave to gather information is sharply circumscribed" once he steps off public thoroughfares and onto areas protected by the Fourth Amendment. *Id.* at 1415. While an officer has an implicit license to go up to and knock on the front door since this is customarily what the general public may do, the scope of that license is limited not only to a particular area but also a particular purpose. *Id.* at 1415-16. There is no customary invitation to introduce a trained dog to explore the area around a home in hopes of discovering incriminating evidence. *Id.* In *Jardines*, the officers approached the front door with a trained drug-sniffing dog for the purpose of using the canine as an instrumentality to gather evidence the officers could not detect with their own senses. *Id.* In so doing, they exceeded the scope of their otherwise lawful presence. *See id.* at 1416–17.

The instant matter is distinguishable from *Jardines*. Unlike in *Jardines*, Sgt. Greene's initial entry upon Defendant's property was not for the express purpose of investigating Defendant. Nor was Sgt. Greene's presence on Defendant's property premised upon the customary, implied license "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 1415. Rather, Sgt. Greene and Justice came to find themselves on Defendant's property while searching for a suspect in the neighborhood. Sgt. Greene and Justice were several houses down from Defendant's property when Justice caught the scent of what Sgt. Greene believed was the breaking and entering suspect. It was not until Sgt. Greene was close enough to Defendant's storage building to smell a strong odor of marijuana emanating from within that Sgt. Greene realized Justice was no longer tracking the suspect but had instead started tracking the scent of marijuana. At the point at which Sgt. Greene smelled the marijuana, the marijuana was considered to be in "plain view." *United States v. Norman*, 701 F.2d 295, 297 (4th Cir. 1983)

6

(stating that in order for an object to be in plain view, "it must only be 'obvious to the senses'" (quoting *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974))). Sgt. Greene noted Defendant's address and left to continue the search for the suspect. It was not until Sgt. Greene terminated his search for the suspect that he returned to Defendant's property to investigate the smell of marijuana coming from the storage building. He then obtained and executed a search warrant, which was issued based not only on Justice's alert but also on Sgt. Greene's own observations.

In contrast to the facts in *Jardines*, Sgt. Greene and Justice had a lawful purpose for being on Defendant's property and within the neighborhood generally – they were tracking a fleeing suspect. They did not enter upon Defendant's property for the purpose of conducting any investigation into Defendant's activities. Defendant does not dispute that Sgt. Greene was lawfully engaged in law enforcement activities at the time he and Justice stumbled upon Defendant's storage building, nor does Defendant contend that Sgt. Greene's actions in tracking the suspect were a ruse to investigate Defendant. Based on these circumstances, the undersigned determines that Sgt. Greene's conduct in entering upon Defendant's property with a trained canine officer was objectively reasonable and did not constitute a search in violation of Defendant's Fourth Amendment rights.

## **CONCLUSION**

For the foregoing reasons, the undersigned RECOMMENDS that Defendant's Motion to Suppress [DE #26] be DENIED.

The Clerk shall send a copy of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from obtaining
7

de novo review by the District Judge on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 27th day of December 2013.

_____
KIMBERLY A. SWANK
United States Magistrate Judge